UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DORAN DUNCAN,

                    Petitioner,                              Case No. 1:23-cv-355

v.                                                                Honorable Paul L. Maloney

MICHAEL BURGESS,

                    Respondent.

_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254.

Petitioner Doran Duncan is incarcerated with the Michigan Department of Corrections at the Oaks

Correctional Facility in Manistee, Manistee County, Michigan. On August 2, 2019, following a

four-day jury trial in the Shiawassee County Circuit Court, Petitioner was convicted of reckless

driving causing death, in violation of Mich. Comp. Laws § 257.6264, operating while intoxicated

causing death (OWI), in violation of Mich. Comp. Laws § 257.6254, being a felon in possession

of a weapon (felon-in-possession), in violation of Mich. Comp. Laws § 750.224f, carrying a

concealed weapon (CCW), in violation of Mich. Comp. Laws § 750.227, use of a firearm during

the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b, and

first-degree felony-murder, in violation of Mich. Comp. Laws § 750.316. "The trial court

sentenced defendant as a habitual offender, second offense, MCL 769.10, to concurrent prison

terms of life without parole for the felony-murder conviction, 28 to 90 months for the CCW and

felon-in-possession convictions, and 125 to 270 months for the OWI and reckless driving

convictions, to be served consecutive to a two-year prison term for the felony-firearm conviction." *People v. Duncan*, No. 350983, 2021 WL 2389976, at *1 (Mich. Ct. App. June 10, 2021).

On April 3, 2023, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:

I.      Petitioner['s] conviction[] for first degree felony murder was not supported by sufficient evidence.

II.     Petitioner was denied due process by the prosecution['s] repeated misconduct of error.

III.    Petitioner's [sic] was denied effective assistance of counsel.[1]

(Pet., ECF No.1, PageID.5–8.) Respondent contends that Petitioner's grounds for relief are meritless.[2] (ECF No. 14.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

---

[1] Petitioner details how counsel rendered ineffective assistance in his supporting brief. (ECF No. 2, PageID.42–55.)

[2] Respondent also contends that habeas grounds II and III are procedurally defaulted. (ECF No. 14, PageID.161–63.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

## Discussion

### I.   Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as

follows:

> [Petitioner's] convictions arise from a serious automobile accident that resulted in the death of George Ramos. On the afternoon of May 18, 2018, defendant was a passenger in a white 2005 Cadillac Deville driven by Kayla Hitz. The vehicle stopped on the side of Sheridan Road, one mile from the intersection with M-13 in Saginaw County. A witness saw Hitz and [Petitioner] scuffling in the car and heard Hitz yell at [Petitioner] to get off of her. Hitz got out of the car and began walking down the road. [Petitioner] also got out of the car and the two continued to argue. As defendant began to follow Hitz, she turned around and said, "I'm going to shoot your ass." Hitz took a gun from her purse and shot toward [Petitioner] four to six times as he stood near the passenger side of the car. Hitz got into the car, started the car, and began to drive off, leaving [Petitioner] behind. [Petitioner] opened the car door while the car was moving and jumped in. The witness's son called 911 to report the incident.
>
> Just before 3:00 p.m., a "be-on-the-lookout" dispatch was radioed to all officers in the area for a white Cadillac with two occupants heading southbound on M-13 toward Shiawassee County. The dispatch indicated that a female occupant had fired shots at a male occupant using a handgun. Shiawassee County Sergeant Brian Smith initiated a traffic stop on the Cadillac at 3:01:26 p.m. Sergeant Smith stopped his vehicle 20 to 25 feet behind the Cadillac, and used felony stop procedures. He pulled out his gun and pointed it at the Cadillac as he stood in the crook between the door and the passenger compartment of his cruiser and shouted instructions to the occupants to turn off the vehicle and keep their hands where he could see them. Village of Lennon Chief of Police Rich Folaron approached from the north and stopped his vehicle in front of the Cadillac. At 3:02 p.m., Sergeant Smith radioed to Chief Folaron to move his vehicle behind Smith's vehicle. Chief Folaron immediately responded that he saw "a lot of action inside that car." [Petitioner] and Hitz exchanged seats, and Hitz got out of the vehicle through the passenger's door and fell onto the ground. At 3:02:21 p.m., [Petitioner] sped off "full throttle," heading southbound on M-13.
>
> Witnesses testified that the white Cadillac drove through the village of Lennon at an estimated speed of 80 to 85 miles per hour in a 35-mile-per-hour zone. Witnesses also reported that the Cadillac was entering the northbound traffic lane while passing vehicles, forcing northbound drivers to leave the roadway to avoid colliding with the Cadillac. One northbound driver who had to swerve off the road testified that as the Cadillac sped between his vehicle and the vehicle that the Cadillac was passing, the driver of the Cadillac "hit the accelerator" and the "engine went full throttle." Another southbound driver said that the Cadillac passed him in the

northbound lane going at least 100 miles per hour and that northbound vehicles were being forced off the road. The Cadillac was traveling south on M-13 toward the intersection with I-69.

About the same time, George Ramos had just exited westbound I-69 and his car, a Cobalt, was stopped at the end of the off-ramp ramp waiting to turn left to head northbound on M-13. As the Cobalt made a left turn, the Cadillac struck the Cobalt nearly head-on, killing Ramos. Chief Folaron did not regain sight of the Cadillac until he got to the intersection of M-13 and I-69 and saw that it had crashed. The crash was reported at 3:04:59 p.m. According to a Michigan State Police accident reconstructionist, the event data recorder obtained from the Cadillac showed that the Cadillac was moving at 107 miles per hour from two to five seconds before impact, and was moving at 104 miles per hour one second before impact. The event data recorder obtained from the Cobalt showed that the Cobalt was stationary four seconds before impact, was moving at four miles per hour three seconds before impact, was moving at 10 miles per hour two seconds before impact, and was moving at 12 miles per hour one second before impact. There was no evidence at the scene of preimpact braking by the Cadillac. The Cadillac was 470 feet to the north when the Cobalt began to enter the traveled lanes three seconds before impact. If the Cadillac had been traveling at the posted speed limit of 55 miles per hour, the Cobalt would have had six seconds to complete its turn. The accident reconstructionist testified that the Cadillac caused the accident. Forensic testing of [Petitioner's] blood after the accident showed that [Petitioner] had six nanograms of active tetrahydrocannabinol (THC) and 52 nanograms of inactive THC in his system.

Police discovered two firearms in the Cadillac, a nine-millimeter handgun legally registered to Hitz and a loaded .40-caliber handgun with the serial number obliterated. [Petitioner] was wearing an empty foam gun holster at the time of the accident. According to the forensic science testimony, it was 470 billion times more likely that [Petitioner] was a contributor to the DNA on the .40-caliber gun than an unrelated unknown individual.

*Duncan*, 2021 WL 2389976, at *1–2.

Jury selection for Petitioner's trial occurred on July 30, 2019. (Trial Tr. I, ECF No. 15-9.) Over the course of three days, the jury heard testimony from numerous witnesses, including law enforcement officials, George Ramos' son, the witness to the argument between Petitioner and Hitz, a former friend of Hitz, individuals who saw the Cadillac speeding through Lennon, and Petitioner himself. (Trial Tr. I, II, III, & IV, ECF Nos. 15-9, 15-10, 15-11, 15-12.) The prosecution also introduced Hitz's testimony from Petitioner's preliminary hearing. On August 2, 2019, after

4

about three hours of deliberation, the jury reached a guilty verdict. (Trial Tr. V, ECF No. 15-13, PageID.1501–1502.) Petitioner appeared before the trial court for sentencing on October 4, 2019. (ECF No. 15-14.)

Petitioner, with the assistance of appellate counsel, appealed his convictions and sentences to the Michigan Court of Appeals. In a counseled brief, Petitioner raised the following claims for relief: (1) there was insufficient evidence to support the felony murder conviction; (2) Petitioner was denied due process because of prosecutorial misconduct; and (3) Petitioner was denied effective assistance of counsel. (ECF No. 15-15, PageID.1599.) In a *pro per* supplemental brief, Petitioner raised the following claims for relief: (1) the prosecution shifted the burden of proof to Petitioner when questioned about the credibility of witnesses; (2) Petitioner was prejudiced by the trial judge's failure to recuse himself; and (3) counsel's ineffectiveness "severely affected the outcome." (*Id.*, PageID.1573.) The court of appeals affirmed Petitioner's convictions and sentences on June 10, 2021. *See Duncan*, 2021 WL 23899765, at *1. The Michigan Supreme Court denied Petitioner's *pro per* application for leave to appeal on April 5, 2022. *See People v. Duncan*, 971 N.W.2d 620 (Mich. 2022). This § 2254 petition followed.[3]

---

[3] On August 14, 2023, Petitioner filed a motion asking the Court to stay these proceedings and hold them in abeyance so that he could return to state court and exhaust his available remedies with respect to new claims of ineffective assistance of trial and appellate counsel. (ECF No. 8.) In an order entered on August 25, 2023, the Court dismissed Petitioner's unexhausted claims without prejudice, granted his motion to stay, directed Petitioner to file his motion for relief from judgment raising his unexhausted claims in the trial court within 30 days, and directed that Petitioner file a motion to amend his § 2254 petition to include any subsequently exhausted claims within 30 days after a final decision by the Michigan Supreme Court. *See Duncan v. Burgess*, No. 1:23-cv-355, 2023 WL 5508837, at *5–6 (W.D. Mich. Aug. 25, 2023). Shortly thereafter, however, Petitioner filed a motion to lift the stay. (ECF No. 10.) In an order (ECF No. 12) entered on September 20, 2023, the Court granted Petitioner's motion and reopened this matter.

## II.      AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

6

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.     Discussion

### A.      Ground I—Sufficiency of the Evidence

As his first ground for relief, Petitioner contends that his conviction for felony murder was not supported by sufficient evidence. (Pet., ECF No. 1, PageID.5.) Petitioner sets forth in his brief that the prosecution's theory was that the felony murder occurred while Petitioner was committing a larceny involving theft of the Cadillac. (Br. Supp. § 2254 Pet., ECF No. 2, PageID.29.) Petitioner contends that there was insufficient evidence that he committed larceny because Petitioner believed he had consent to take the vehicle. (*Id.*, PageID.30.) Petitioner also contends that there was insufficient evidence to support a finding of malice. (*Id.*, PageID.32.)

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's sufficiency challenge:

> In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the

9

> elements of a crime. The prosecution need not negate every reasonable theory of
> innocence; instead, it need only prove the elements of the crime in the face of
> whatever contradictory evidence is provided by the defendant. We resolve all
> conflicts in the evidence in favor of the prosecution. [Citations omitted.]

*Duncan*, 2021 WL 2389976, at *2 (quoting *People v. Mikulen*, 919 N.W.2d 454, 459 (Mich.

2018)). Although the court of appeals cited state authority as the source of the standard, the cases

cited within *Mikulen* identify *Jackson* as the source. *See People v. Wolfe*, 489 N.W.2d 748, 751

(Mich. 1992).

The state court's application of the correct standard eliminates the possibility that the

resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in

*Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different,"
> "opposite in character or nature," or "mutually opposed." Webster's Third New
> International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests
> that the state court's decision must be substantially different from the relevant
> precedent of this Court. The Fourth Circuit's interpretation of the "contrary to"
> clause accurately reflects this textual meaning. A state-court decision will certainly
> be contrary to our clearly established precedent if the state court applies a rule that
> contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not

"contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our
> cases to the facts of a prisoner's case would not fit comfortably within
> § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court
> decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland*
> [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and,
> applying that framework, rejects the prisoner's claim. Quite clearly, the state-court
> decision would be in accord with our decision in *Strickland* as to the legal
> prerequisites for establishing an ineffective-assistance claim, even assuming the
> federal court considering the prisoner's habeas application might reach a different
> result applying the *Strickland* framework itself. It is difficult, however, to describe
> such a run-of-the-mill state-court decision as "diametrically different" from,
> "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our
> clearly established precedent. Although the state-court decision may be contrary to
> the federal court's conception of how *Strickland* ought to be applied in that
> particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the court of appeals' conclusion regarding the sufficiency of the evidence is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The court of appeals first set forth the elements of felony murder and larceny. *See Duncan*, 2021 WL 2389976, at *3. The court of appeals then applied the sufficiency standard as follows:

> [Petitioner] argues that the evidence was insufficient to show that he took the Cadillac without Hitz's consent. However, Hitz testified that she did not give [Petitioner] permission to take her car and that [Petitioner] stole her car. Hitz's testimony was sufficient to allow the jury to find beyond a reasonable doubt that [Petitioner] did not have consent to take Hitz's car.

> [Petitioner] also argues that the evidence was insufficient to show that he intended to permanently deprive Hitz of her car. He argues that because he and Hitz were friendly, the prosecution failed to prove beyond a reasonable doubt that he intended never to return the car. [Petitioner] has provided no authority for the argument that one cannot intend to permanently deprive a person one knows of his or her property. A prosecutor only needs to provide minimal circumstantial evidence to prove that the defendant had the requisite intent. *People v. Johnson–El*, 299 Mich. App. 648, 653; 831 N.W.2d 478 (2013). This Court has held that evidence of the defendant's fleeing from the scene of the crime supports an inference of "consciousness of guilt," which may show intent. *See People v. Goodin*, 257 Mich. App. 425, 432; 668 N.W.2d 392 (2003) (quotation marks and citation omitted). The jury could reasonably find from [Petitioner's] actions that he had the intent to permanently deprive Hitz of her car when he sped off in Hitz's car without her permission and left her behind. In addition, [Petitioner] testified that he intended to drive the car to Lansing, and he drove recklessly at speeds of over 100 miles per hour. These actions support the minimal circumstantial evidence necessary to prove that [Petitioner] intended to permanently deprive Hitz of her car. Viewed in a light most favorable to the prosecution, the evidence was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that [Petitioner] committed the offense of larceny.

> [Petitioner] also argues that the evidence was not sufficient to support the requisite malice element of felony murder. Testimony indicated that [Petitioner] was driving at excessive speeds, including through a small village, to flee from police. Witnesses were shocked at how fast the Cadillac traveled on M-13 through the village of Lennon, and how fast it was traveling after it left the village and traveled toward I-69 after leaving Lennon. Witnesses said that the Cadillac passed several

cars at an excessive rate of speed and forced drivers traveling in the opposite direction to go off of the road in order to avoid a collision with the Cadillac. An accident investigator determined that the Cadillac was traveling 107 miles per hour three seconds before the collision in a 55-mile-per-hour zone, and that the speed one second before impact was 104 miles per hour. Further, the evidence showed no preimpact braking that would have been able to stop the vehicle. A toxicology report demonstrated that [Petitioner] had active THC in his system. The evidence of [Petitioner's] continuous excessive speed after leaving the traffic stop sufficed to establish [Petitioner's] intent to do an act in a manner that created a very high risk of death or great bodily harm, with knowledge that death or great bodily harm was the probable result of driving in that manner. *See Carines*, 460 Mich. at 758-759. [Petitioner] asserts that his testimony—that he fled the scene because, as a black man, he was motivated by his legitimate fear of police—contradicts the notion that he acted with the requisite intent. However, the jury did not find his testimony credible. The jury decides issues of credibility. *Mikulen*, 324 Mich. App. at 20. Accordingly, the evidence was sufficient to allow a rational jury to find beyond a reasonable doubt that [Petitioner] committed felony murder.

*Duncan*, 2021 WL 2389976, at *3–4 (footnote omitted).

In his brief supporting his § 2254 petition, Petitioner essentially reiterates the arguments that he raised—and that were rejected—in the state courts. Petitioner contends that he and Detective Sergeant Moore "testified that Petitioner believed he had consent to take the vehicle." (Br. Supp. § 2254 Pet., ECF No. 2, PageID.30.) Petitioner argues that at the preliminary hearing, Hitz testified that she got out of the car on her own, and that the fact that Hitz "ignored [Sergeant] Smith's direction to turn off her car, and left the keys in the vehicle also support[s] the position that she was allowing Petitioner to drive the car." (*Id.*, PageID.31.) Petitioner reiterates that he did not intend to permanently deprive Hitz of the vehicle because they had known each other for years. (*Id.*) Finally, Petitioner contends that the prosecution failed to present sufficient evidence of malice because he had no intent to harm anyone, only an intent to leave the traffic stop. (*Id.*, PageID.32.) Petitioner also avers that he "tried to brake, but it[] wasn't enough." (*Id.*) Finally, Petitioner references that Hitz "testified that she blacked out, and has a poor memory, reducing the weight that should be given to her testimony." (*Id.*)

As set forth above, the court of appeals rejected the arguments made by Petitioner. To prevail on his sufficiency claim now, Petitioner must show that the inferences urged by the appellate court are unreasonable. Despite Petitioner's assertion, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Petitioner can overcome that presumption with clear and convincing evidence; he has not. He does not offer any evidence to show that the court of appeals' factual determinations are unreasonable on the record.

In *Coleman v. Johnson*, 566 U.S. 650, 655 (2012), the Supreme Court provided some guidance with respect to the distinction between a reasonable inference and mere speculation. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation, and it is not a particularly onerous burden. The Court went so far as to say, "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

Petitioner has offered nothing from which this Court could conclude that the court of appeals' inferences were irrational. Certainly, one could interpret the underlying events differently and reach the opposite conclusions, but that does not render the court of appeals' conclusions and inferences irrational. Petitioner, therefore, has failed to meet his burden.

Moreover, Petitioner's arguments essentially invite this Court to reweigh the witnesses' credibility and resolve all conflicts and make all inferences in his favor. Under *Jackson*, a habeas court is not required to sift through the evidence and place it on one side of the scale or the other for the purpose of assessing whether the jurors' estimation of the balance is correct. Instead, the Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt

considering that evidence. It is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are reasonable. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

In sum, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the felony murder verdict is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief on habeas ground I.

### B.    Ground II—Prosecutorial Misconduct

In habeas ground II, Petitioner contends that he was denied due process because of the prosecution's "repeated misconduct of error." (Pet., ECF No. 1, PageID.7.) Specifically, Petitioner contends that the prosecutor committed plain error during closing arguments by "ma[king] several false statements, arguing that they were true to the jury." (Br. Supp. § 2254 Pet., ECF No. 2, PageID.36.) Petitioner takes issue with the following statements made by the prosecutor: (1) that Petitioner testified that Hitz threw her keys to him during the traffic stop; (2) Petitioner was untruthful when he testified that Hitz handed her keys to him, then changed his story; (3) Petitioner intentionally caused the crash; and (4) Petitioner was a major contributor to the DNA samples tested. Petitioner also faults the prosecutor for repeatedly asking Petitioner, on cross-examination, if other witnesses had lied. (*Id.*, PageID.36–40.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the

14

prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11– 12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. 637, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

On direct appeal, the court of appeals noted that Petitioner's assertions of prosecutorial error had not been preserved for review and so would be evaluated for plain error. *See Duncan*, 2021 WL 2389976, at *4. The court of appeals noted that Petitioner "fail[ed] to discuss the alleged errors in the context of the record, and he fail[ed] to present argument to demonstrate that any of the prosecutor's alleged errors affected his substantial rights." *Id.* at *5. The court of appeals noted that although Petitioner's claims of prosecutorial error could be deemed abandoned, the court had

reviewed that "with respect to six of the claims that the prosecutor did not commit error." *Id.* at *5 n.4. The court of appeals went on to "address two of the arguments in which the prosecutor concedes error in order to determine whether the errors affected [Petitioner's substantial rights." *Id.*

Specifically, the court of appeals addressed Petitioner's argument that the prosecution falsely stated, during both closing arguments and cross-examination of Petitioner, that Petitioner had testified on direct examination that Hitz threw the car keys to him during the traffic stop, as well as Petitioner's argument that the prosecutor erred by asking Petitioner whether witnesses were lying when they offered testimony that was inconsistent with Petitioner's testimony. The court of appeals wrote:

> First, the prosecution concedes that the prosecutor's cross-examination of [Petitioner] and closing argument made a factual statement that was not supported by the evidence when she insisted during the cross-examination of [Petitioner] and during closing arguments that [Petitioner] had testified on direct examination that Hitz threw the car keys to him during the traffic stop. The prosecutor used the misstatement of the evidence to argue that [Petitioner] was not being truthful. The jury, however, had recently heard [Petitioner's] testimony, which did not include testimony that Hitz gave him the keys, and [Petitioner] denied the prosecutor's erroneous interpretation of his prior testimony. In context, the references were not so egregious that any prejudice could not have been remedied by a curative instruction, nor did the references result in a miscarriage of justice. The error therefore did not affect [Petitioner's] substantial rights. *See People v. Mayhew*, 236 Mich. App. 112, 122-123; 600 N.W.2d 370 (1999) ("Because defendant failed to object to the alleged instances of prosecutorial conduct, we will only review this issue if a curative instruction could not have remedied the prejudicial effect of the prosecutor's comments or if the failure to consider the issue would result in a miscarriage of justice.").
>
> Next, the plaintiff concedes that the prosecutor erred by asking [Petitioner] whether prosecution witnesses were lying when they offered testimony that was inconsistent with defendant's testimony. In *People v. Buckey*, 424 Mich. 1, 17; 378 N.W.2d 432 (1985), the Court held that it was "improper for the prosecutor to ask defendant to comment on the credibility of prosecution witnesses." In *Buckey*, portions of the defendant's testimony conflicted with the testimony of the complainant, eyewitnesses, and a police detective. *Id.* at 5-6, 7 n. 3. The prosecutor asked the defendant during cross-examination whether the defendant thought that the prosecution's witnesses "were lying." *Id.* at 7 n. 3, 16-17. *Buckey* noted that the

prosecutor's strategy was to invite the defendant to label the prosecution's witnesses as liars and thereby discredit the defendant. *Id.* at 17. The Court found that this conduct was improper because the defendant's opinion of witnesses' credibility "is not probative of the matter." *Id.* The Court, however, held that the error did not result in unfair prejudice to the defendant and was harmless. *Id.* The Court reasoned that the "defendant dealt rather well with the questions," that defense counsel did not object to the questions, and that any prejudice could have been cured by a timely objection resulting in a prohibition on further questions of the type at issue or an appropriate cautionary instruction. *Id.* at 17-18.

Here, the prosecutor erred by asking [Petitioner] whether the witnesses were lying in order to discredit [Petitioner]. [Petitioner] does not attempt to show that his substantial rights were affected by the error. As in *Buckey*, [Petitioner] handled the questions well. Additionally, trial counsel did not object to the questions, and any prejudice could have been cured by a timely objection. Further, the trial court advised the jury that "it's your job to decide what the facts of this case are. You must decide which witnesses you believe and how important you think their testimony is." Jurors are presumed to follow their instructions. *People v. Stevens*, 498 Mich. 162, 177; 869 N.W.2d 233 (2015). The error did not affect [Petitioner's] substantial rights.

*Duncan*, 2021 WL 2389976, at *5–6.

Here, although the court of appeals concluded that the prosecutor acted improperly in these two instances, Petitioner fails to show that the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). Under Michigan harmless error jurisprudence, unpreserved nonstructural constitutional error is reviewed under a plain error standard. *People v. Cornell*, 646 N.W.2d 127, 142–43 (Mich. 2002); *People v. Carines*, 597 N.W.2d 130, 143 (Mich. 1999). To prevail, the defendant must show "a plain error that affected substantial rights." *Carines*, 597 N.W.2d at 143. The Michigan Supreme Court assesses whether the error affected the outcome of the proceeding to determine whether the defendant has made the necessary showing. *People v. Davis*, 983 N.W.2d 325, 336–337 (Mich. 2022) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). That is "the same kind of inquiry" the Michigan courts use to determine whether error is harmless: was it "outcome-determinative." *Id.* The Michigan Supreme Court equates "outcome

determination" to "prejudice" when separating plain from harmless error, *People v. Vaughn*, 821 N.W.2d 288, 303 (Mich. 2012), and when evaluating the *Strickland* standard for ineffective assistance of counsel, *People v. Harris*, 840 N.W.2d 307, 308 (Mich. 2013).

The impact of an error on the outcome of the proceedings is also the focus of federal harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as the standard for determining whether habeas relief if appropriate "whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "Do I, the judge, think that the error substantially influenced the jury's decision?"); *Brown v. Davenport*, 596 U.S. 118, 126 (2022) (stating that "a state prisoner . . . must show that the error had a 'substantial and injurious effect or influence' on the outcome of his trial" (quoting *Brecht*, 507 U.S. at 637)). The appellate court's decision that the error was not outcome determinative is the equivalent of a determination that the error was harmless under *Brecht*. *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995).

*Brown* states that "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." 596 U.S. at 127. Accordingly, the Court must defer to that adjudication under § 2254(d)(1) unless the "petitioner persuades [the Court] that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id*. at 1525 (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). This is a standard that is intentionally difficult to meet. *See Woods*, 575 U.S. at 316.

In his brief supporting his petition, Petitioner merely reiterates that counsel falsely "hammered [the statement regarding Hitz giving Petitioner the keys] several times during trial in support of her argument that [P]etitioner was dishonest, when it was actually the prosecutor who was being deceptive." (Br. Supp. § 2254 Pet., ECF No. 2, PageID.36.) Petitioner also reiterates

that it was improper for the prosecutor to ask Petitioner to comment on whether the prosecution's witnesses were lying. (*Id.*, PageID.39–40.) He argues that the "strength of the evidence against him was not so overwhelming that it negated the improper comments made by the prosecutor." (*Id.*, PageID.41.) By convicting Petitioner, however, the jury presumably concluded that Petitioner was not credible and that the evidence against him was overwhelming. Petitioner provides no argument suggesting that no fairminded jurist could come to the conclusion reached by the court of appeals under Supreme Court precedent. Petitioner simply fails to demonstrate that the prosecutor's error had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637, particularly in light of evidence admitted at trial that Petitioner took over the driver's seat in the Cadillac during the traffic stop, Hitz exited the car, Petitioner took off from the traffic stop at a high rate of speed, and Petitioner was travelling at speeds well over the posted speed limits when he ultimately hit Ramos' vehicle, killing Ramos.

Given Petitioner's failure to persuade the Court that no fairminded jurist could reach the conclusion arrived at by the court of appeals, the Court will defer to the court of appeals' determination. The Court's deference to the court of appeals' determination that these two instances of prosecutorial error were not outcome determinative necessarily leads to a conclusion that Petitioner has failed to demonstrate that the court of appeals' rejection of these claims of prosecutorial misconduct is contrary to, or an unreasonable application of, clearly established federal law.

Petitioner also takes issue with several other statements made by the prosecutor during closing arguments. For example, he asserts that the prosecutor misrepresented the evidence when she argued that Petitioner intentionally caused the crash. (Br. Supp. § 2254 Pet., ECF No. 2, PageID.38.) He also argues that the prosecutor made arguments "about DNA that were not

supported by any testimony in this record." (*Id.*) Petitioner suggests that the prosecutor labeled him as a major contributor of the DNA, when these statements were not supported by the testimony provided.

"[T]he government may not rely on prejudicial facts not in evidence when making its closing arguments." *United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007). Nonetheless, "[a] prosecutor has 'leeway to argue reasonable inferences from the evidence' during closing arguments." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000)). Petitioner, however, has not demonstrated that any misstatements by the prosecutor induced the jury "to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18–19. This Court's review of the record does not lead to a conclusion that the prosecutor deliberately mischaracterized the evidence. Furthermore, the trial court instructed the jury to consider only the evidence admitted during trial, and that counsel's closing arguments did not constitute evidence. (Trial Tr. V, ECF No. 15-13, PageID.1471.) A jury is presumed to follow its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner has not demonstrated that any misstatements by the prosecutor during closing arguments "so infected the trial with unfairness" that Petitioner was denied due process. Petitioner, therefore, is not entitled to habeas relief with respect to his other assertions of prosecutorial misconduct.

In sum, Petitioner has not demonstrated that the court of appeals' rejection of his myriad claims of prosecutorial misconduct is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas ground II.

### C.       Ground III—Ineffective Assistance of Counsel

As habeas ground III, Petitioner contends that he was denied effective assistance of counsel. (Pet., ECF No. 1, PageID.8.) In his brief in support, Petitioner asserts that: (1) he was effectively deprived of counsel because of a conflict of interest; (2) counsel failed to request a due diligence hearing; (3) counsel failed to present a defense; (4) counsel failed to request a limiting instruction; and (5) counsel failed to present an expert witness to "testify about systemic racism." (Br. Supp. § 2254 Pet., ECF No. 2, PageID.43–55.)

### 1.       Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his claims of ineffective assistance on direct appeal, and the court of appeals addressed them under the following standard:

> To establish ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Trakhtenberg*, 493 Mich. 38, 51; 826 N.W.2d 136 (2012). Accordingly, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. 668, 690; 104 S. Ct. 2052; 80 L. Ed. 2d 674 (1984); *Trakhtenberg*, 493 Mich. at 52. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Secondly, [Petitioner] must show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual

22

> predicate for his claim." *People v. Carbin*, 463 Mich. 590, 600; 623 N.W.2d 884 (2001). "[T]his Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v. Davis*, 250 Mich. App. 357, 368; 649 N.W.2d 94 (2002). Counsel is presumed to have afforded effective assistance, and [Petitioner] bears a heavy burden of proving otherwise. *People v. Traver*, 328 Mich. App. 418, 422; 937 N.W.2d 398 (2019).

*Duncan*, 2021 WL 2389976, at *6. The court of appeals' citation to *Strickland* means that there is no question here that the court of appeals applied the correct standard. Petitioner, therefore, can only overcome the deference afforded to state court decisions if the court of appeals' determinations were based on an unreasonable application of *Strickland* or if the court of appeals' resolutions were based on unreasonable determinations of the facts. 28 U.S.C. 2254(d).

### 2.      Conflict of Interest

Petitioner first suggests that attorney Corwin, who served as lead counsel at Petitioner's trial, labored under a conflict of interest. (Br. Supp. § 2254 Pet., ECF No. 2, PageID.43.) Specifically, Petitioner argues that prior to appearing as counsel of record for Petitioner, attorney Corwin "appeared on [a] motion to intervene for purposes of opposing a motion for funds for an expert[] brought by [P]etitioner's then attorney, Mr. Johnson." (*Id.*) Petitioner avers that the motion to intervene was denied, but "not until he had successfully opposed the motion for funds for an expert." (*Id.*)

The court of appeals rejected this claim, stating:

> [Petitioner] first argues that he had an irreconcilable conflict of interest with one of his two trial counsel because counsel, before being appointed as [Petitioner's] third court-appointed attorney, had moved to intervene on behalf of the Shiawassee County Public Defender's Office with respect to [Petitioner's] motion seeking authority to retain forensic experts to review the crime lab's forensic testing results. The motion to intervene asserted that the defender's office budget was limited and that [Petitioner's] motion failed to adequately explain a nexus between the crime lab's DNA results and the need for an independent expert. The trial court denied the motion to intervene. [Petitioner] fails to explain how the public defender's office's unsuccessful motion to intervene presented an actual conflict of interest, and we cannot conceive of one on this record. Absent such an explanation, relief is not warranted.

23

*Duncan*, 2021 WL 2389976, at *6.

For purposes of an ineffective assistance of counsel claim, prejudice is presumed if counsel is shown to have been burdened by an actual conflict of interest. *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 345–50 (1980)). However, even in the case of such a conflict of interest, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Sullivan*, 446 U.S. at 350).

Although Petitioner does not explicitly assert that attorney Corwin actively represented conflicting interests, an argument could be made that the motion to intervene that was filed by attorney Corwin on behalf of the Public Defender's Office was directly in conflict with Petitioner's desire to retain, at government expense, a forensic expert to review DNA testing results. Nevertheless, Petitioner fails to demonstrate "an actual conflict of interest [that] adversely affected [attorney Corwin's] performance." *Strickland*, 466 U.S. at 692 (quoting *Sullivan*, 446 U.S. at 350). The United States Court of Appeals for the Sixth Circuit has set forth the showing necessary to establish such a conflict:

> To find an actual conflict, we require petitioner to "point to specific instances in the record to suggest an actual conflict or impairment of [his] interests" and "demonstrate that the attorney made a choice between possible alternative courses of action" . . . . Counsel's choices between alternative courses is evidence of adverse effect only if it is not part of a legitimate strategy, "judged under the deferential review of counsel's performance prescribed in *Strickland*."

*McElrath v. Simpson*, 595 F.3d 624, 624–25 (6th Cir. 2010) (citations omitted).

The record reflects that the trial court held a hearing regarding Petitioner's motion for funding and the motion to intervene on April 1, 2019. (ECF No. 15-6.) At the hearing, attorney Corwin noted that the Public Defender's Office had "helped other court-appointed attorneys in the process of loaning out our investigator, paying for other tests when they've shown a reason why

24

they needed it, some nexus, reason for that," and that Petitioner had not shown that nexus because he had not demonstrated that "something [was] wrong with maybe the prosecutor's experts who tested everything." (*Id.*, PageID.368.) Attorney Corwin stated that the office had a budget of $10,000.00 for experts and testing, and that they office had "probably tapped into about a third of that, at this point." (*Id.*, PageID.369.)

The trial court noted that the motion to intervene based upon the needs of the office's budget "really doesn't control the Court's analysis." (*Id.*, PageID.370.) The court denied the motion to intervene, noting that Petitioner was entitled to public funding, whether "it comes from the Public Defender's budget, the Court's budget, or the county's budget." (*Id.*) The trial court also denied Petitioner's motion for funding as insufficient, noting that there was "no showing of a reasonable probability that those experts would assist the defense, nor is there any showing that denial of the request would result in a fundamentally unfair trial." (*Id.*, PageID.373.)

Petitioner has not—and cannot—make the requisite showing of an actual conflict as set forth in *McElrath*. Petitioner fails to point to specific instances that suggest a conflict and that attorney Corwin was impaired by his prior unsuccessful attempt to intervene on behalf of the Public Defender's Office. As the trial court noted, the Public Defender's concerns about its budget had no bearing on the Court's decision. Rather, the trial court denied Petitioner's motion for funding because he failed to demonstrate that the proposed experts would reasonably assist his defense. The record reflects that attorney Corwin and co-counsel thoroughly cross-examined all of the prosecution's experts with respect to issues surrounding the DNA testing conducted in Petitioner's case.

As discussed by the court of appeals, Petitioner's arguments are insufficient to demonstrate the existence of an actual conflict of interest. Petitioner has not demonstrated that the court of

appeals' rejection of this claim was contrary to, or an unreasonable application of, *Strickland*. Accordingly, he is not entitled to relief on this claim of ineffective assistance.

### 3.    Failure to Request Due Diligence Hearing

Next, Petitioner faults counsel for not requesting that the trial court hold a due diligence hearing regarding the prosecutor's "diligence in producing" Hitz as a witness at trial. (Br. Supp. § 2254 Pet., ECF No. 2, PageID.44.) Petitioner contends that if Hitz had been produced as a witness at trial, "it is highly likely that her testimony would have presented a different version of the events than that was given by the prosecution during trial." (*Id.*, PageID.498.)

> The court of appeals summarily rejected Petitioner's argument, stating:

> [Petitioner] also argues that trial counsel was ineffective by failing to request an evidentiary hearing regarding the prosecution's due diligence to produce Hitz for trial. Before the prosecution began its case-in-chief, the prosecutor made an offer of proof as to Hitz's unavailability and attempts to locate and serve her. Trial counsel also identified the efforts that the public defender's investigator took to locate Hitz. [Petitioner] fails to explain the need for an evidentiary hearing in light of the prosecution's offer of proof and the parties' arguments regarding due diligence, and he also fails to explain how he was prejudiced by his counsel's failure to request an evidentiary hearing under these circumstances. Relief is not warranted for this claim of error.

*Duncan*, 2021 WL 2389976, at *7.

Prior to starting opening statements, the trial court asked the parties if there were any matters that needed to be addressed outside the presence of the jury. (Trial Tr. I, ECF No. 15-9, PageID.553.) The prosecutor first raised Hitz's unavailability as a witness. (*Id.*) The prosecutor noted that Hitz "dodged us during the prelim, and we finally got her served, and she testified at the preliminary examination, but she's been in the wind ever since." (*Id.*, PageID.554.) The prosecutor noted that Detective Sergeant Moore and Detective Trooper Antonia Taylor both made attempts to serve a subpoena on Hitz. (*Id.*) Trooper Taylor went to an address provided by the Saginaw County Sheriff's Office. (*Id.*) At that address, Trooper Taylor spoke to Hitz's mother, who said

that she had not seen Hitz "in a couple of months and thinks she's on drugs; said she may be staying at the Rescue Mission." (*Id.*) Officers then went to the Rescue Mission, where they "found out that [Hitz] had been there, but that she had left at the end of June." (*Id.*) The prosecutor also noted that the defense's investigator had attempted to locate Hitz with no success. (*Id.*) The prosecutor presented an offer of proof regarding Detective Sergeant Moore's attempts to locate Hitz as well. (*Id.*, PageID.557.)

Attorney Corwin objected to admission of Hitz's testimony from the preliminary examination. (*Id.*, PageID.558.) He argued that his investigator went "farther and above the prosecution" to attempt to locate Hitz. (*Id.*) Attorney Corwin stated that his investigator made telephone contact with Hitz's mother and stepfather and had dinner with them. (*Id.*) The investigator tracked down Hitz's residence and learned that Hitz was "due back with her two kids." (*Id.*, PageID.559.) The investigator also showed a picture of Hitz to the neighbor and learned that Hitz had been at the residence in question. (*Id.*)

Attorney Corwin argued that there was "far more" that the prosecution could have done to track down Hitz.  (*Id.*) He asserted that the prosecution "did not attempt to telephone the witness." (*Id.*) Attorney Corwin argued that the prosecution failed to follow up with Hitz's grandmother. (*Id.*) They also did not utilize the Bay City's County Services, nor did they "check with the Post Office to see if there was a change of address form." (*Id.*) Attorney Corwin noted further that the prosecution did not check with the Department of Corrections or county jails to see if Hitz had been incarcerated. (*Id.*) The prosecution did not check with the Department of Human Services, nor did they check with any updates from the Secretary of State. (*Id.*, PageID.560.) Attorney Corwin argued that the defense "missed [Hitz] by a few minutes in attempting to serve her," and that the defense "did far more due diligence than the prosecutor." (*Id.*) Alternatively, attorney

Corwin argued that if the court did allow admission of the preliminary examination testimony, the recorded transcript that was taped should be played for the jury so that the jury could judge Hitz's demeanor. (*Id.*)

In response, the prosecutor noted that prosecution investigators tried to ping Hitz's phone. (*Id.*, PageID.562.) That is how she was served the first time; however, Hitz "got wise to [them] and turned her phone off." (*Id.*) The prosecution faulted attorney Corwin for not making any attempts to locate Hitz until "three days ago." (*Id.*) The prosecution also objected to playing the taped testimony. (*Id.*)

The trial court did not "see anything on this record where the People were attempting to hide this witness, or somehow circumvent bringing her into court." (*Id.*, PageID.564.) The trial court concluded, based upon the offer of proof and arguments given by the prosecution, that there had been "diligent, good-faith efforts to serve and procure this witness." (*Id.*, PageID.565.) The court ruled that the transcript could be read into the record because it was the certified record; the recording itself was not certified. (*Id.*)

Here, Petitioner fails to demonstrate any prejudice from counsel's failure to request a due diligence hearing. Presumably, at such a hearing, the officers who had attempted to serve a subpoena upon Hitz would have reiterated the information regarding the steps they took to do so that was offered to the court by the prosecutor. The defense's investigator may have testified regarding his efforts to locate Hitz as well. A due diligence hearing would have merely been cumulative of the offers of proof and arguments raised by the parties at the start of trial, and Petitioner offers nothing to demonstrate that the court would have ruled in favor of the defense and excluded Hitz's preliminary examination testimony from being read into the record had a due diligence hearing been conducted. Petitioner, therefore, has failed to demonstrate that the court of

appeals' rejection of this argument is contrary to, or an unreasonable application of, *Strickland*, and he is not entitled to federal habeas relief with respect to this assertion of ineffective assistance of counsel.

### 4.    Failure to Present a Defense

Next, Petitioner faults counsel for failing to present "the defense of accident." (Br. Supp. § 2254 Pet., ECF No. 1, PageID.50.) Petitioner avers that the medical examiner ruled that the death was an accident, and that counsel's "arguments included that Petitioner had no intent to hurt anyone." (*Id.*) Overall, it appears that Petitioner faults counsel for failing to request a jury instruction regarding the defense of accident. (*Id.*)

The court of appeals rejected Petitioner's argument, stating:

[Petitioner] argues that he did not have the intent to kill and that the victim's death was the result of an accident. [Petitioner] appears to be basing his argument on the fact that the medical examiner determined that Ramos's manner of death was "accidental." However, the medical examiner testified that when a person is killed in a motor vehicle accident, the manner of death, by convention, is categorized as accidental unless the motor vehicle was being used as a weapon against the person who was killed. Overwhelming evidence of [Petitioner's] erratic driving at excessive speeds was presented. A death that results from a force set in motion by the defendant that is likely to cause death or great bodily harm cannot be considered accidental. One of the natural risks of driving erratically at excessive speed is a crash with another vehicle that could result in death or great bodily harm. Because the *mens rea* for felony murder was overwhelmingly established, the defense of accident was not tenable, and trial counsel's failure to request the jury instruction was not objectively unreasonable.[5]

Moreover, even if trial counsel was ineffective in this regard, [Petitioner] has failed to demonstrate a reasonable probability that the failure to instruct the jury on accident affected the outcome of trial. The trial court instructed the jury that to convict [Petitioner] of felony murder it must find that defendant had "one of these three states of mind: He intended to kill, or he intended to do great bodily harm to [the victim], or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions." Thus, any finding that the victim's death was accidental would have been inconsistent with the jury's conviction of defendant for felony murder. *Compare People v. Hawthorne*, 474 Mich. 174, 185; 713 N.W.2d 724 (2006) (holding that the defendant failed to demonstrate that the trial court's failure to instruct on the accident defense undermined the reliability of the verdict because the jury

instructions on the intent element of murder were clear that a finding of accident would be inconsistent with a finding that the defendant possessed the intent requirement for murder).

_____

[5] Indeed, trial counsel argued in closing that defendant was guilty only of reckless driving causing death. Logically, the malice element of felony murder can be proven in much the same manner as the "willful and wanton disregard for safety" element of reckless driving causing death.

*Duncan*, 2021 WL 2389976, at *7–8 & n.5.

Petitioner offers nothing to rebut the court of appeals' conclusion. He argues only that the "[a]ccident instruction would have aided the jury in reaching a correct verdict in this case, and dovetailed with counsel's arguments on Petitioner's behalf." (Br. Supp. § 2254 Pet., ECF No. 2, PageID.50.) Petitioner does not rebut the court of appeals' conclusion that testimony established that Petitioner was driving erratically at excessive speeds, and that a risk of doing so was a crash with another vehicle that caused death. Petitioner may not have meant to kill Mr. Ramos, but his actions created a high risk that death would occur should Petitioner crash into another vehicle while fleeing from police.

Given the overwhelming evidence against Petitioner, he fails to demonstrate that the jury would have returned an acquittal had counsel requested that the court instruct the jury on the defense of accident. "[O]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Accordingly, Petitioner is not entitled to relief with respect to this assertion of ineffective assistance of counsel, as he fails to demonstrate that the court of appeals' rejection of his claim was contrary to, or an unreasonable application of, *Strickland*.

### 5.   Failure to Request a Limiting Instruction

Next, Petitioner faults counsel for not requesting a limiting instruction regarding the testimony presented concerning Petitioner's outstanding warrants. (Br. Supp. § 2254 Pet., ECF No. 2, PageID.53.) Petitioner avers that the jury "should have been told that the warrant information [should] not . . . be used to determine that Petitioner committed these crimes because he had a criminal background. The evidence had no bearing on motive, intent, modus operandi, or any other proper issue." (*Id.*)

> The court of appeals rejected this assertion of ineffective assistance, stating:
>
> [Petitioner] also argues that his counsel was ineffective by failing to request a limiting instruction when the prosecutor was permitted to elicit evidence that [Petitioner] had outstanding warrants to show why [Petitioner] fled from the police. The trial court contemporaneously instructed the jury: "Please don't concern yourselves with what these warrants may be . . . . [I]t could be a parking ticket ... or it could be a meter violation[;] . . . we don't know." The trial court's instruction was effectively a limiting instruction. Trial counsel's failure to specifically request a limiting instruction was not objectively unreasonable. Additionally, the trial court instructed the jury:
>
>> There's evidence that the Defendant had outstanding warrants at the time of the alleged crimes. You may only consider those warrants in determining the Defendant's state of mind at the time of the alleged crimes. You may not consider them for any other purpose.
>
> Jurors are presumed to follow their instructions. *Stevens*, 498 Mich. at 177. [Petitioner] has not shown a reasonable probability that the outcome of the trial would have been different had trial counsel requested a limiting instruction.

*Duncan*, 2021 WL 2389976, at *8.

Here, Petitioner merely reiterates the arguments that have already been rejected by the state courts. He fails to describe what further limiting instruction counsel should have requested that the jury be given. The court of appeals' determination that jurors are presumed to follow their instructions is entirely consistent with clearly established federal law. *See Weeks*, 528 U.S. at 234. Given the overwhelming evidence against Petitioner, Petitioner simply fails to demonstrate that a

request by counsel for further limiting instructions regarding this testimony would have led to an acquittal. Because Petitioner has not demonstrated that the trial court's rejection of this claim of ineffective assistance was contrary to, or an unreasonable application of, *Strickland*, he is not entitled to habeas relief on this basis.

### 6.    Failure to Present Expert Testimony Regarding "Systemic Racism"

Finally, Petitioner contends that he "was denied a trial before a jury of his peers when the jury, as well as the panel from which the jury was selected, contained no African-Americans, and even the Judge seemed unaware of the disparate treatment of African-Americans by police." (Br. Supp. § 2254 Pet., ECF No. 2, PageID.54.) Petitioner suggests that counsel "could have gotten an expert to testify about systemic racism, particularly with all the police killings of African-American males." (*Id.*)

A review of the record indicates that Petitioner's argument in support of this claim is copied from his appellate counsel's brief on direct appeal. (*Compare id.* to ECF No. 15-15, PageID.1653.) On direct appeal, the court of appeals summarily rejected Petitioner's claim, stating:

> [Petitioner] next presents an unintelligible argument regarding jury composition that does not coherently present a claim of ineffective assistance of counsel. [Petitioner's] argument does not cite legal authority, nor does it offer any factual support. Further, our review is limited to mistakes apparent on the record, and there is no evidence on the record with respect to the jury array or the composition of the jury. This argument is abandoned. *Kelly*, 231 Mich. App. at 640-641.

*Duncan*, 2021 WL 2389976, at *8.

By adopting the argument made by appellate counsel and rejected by the state courts, Petitioner fares no better with this assertion of ineffective assistance of counsel before this Court. It is well established that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial" and "is fundamental to the American system of justice." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

32

The fair cross-section requirement, however, applies to the venire from which a jury is drawn, and not the petit jury itself. *See id.* at 538 (noting that the Court was "impos[ing] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population"). To establish a prima facie violation of the fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Here, Petitioner fails to provide any evidence as to how his jury pool was selected, nor does he detail how that process was discriminatory other than to suggest there were no African-Americans in the jury pool. The Michigan Court of Appeals has noted that "[m]erely showing one cause of alleged underrepresentation does not rise to a 'general' underrepresentation that is required for establishing a prima facie case." *People v. Howard*, 575 N.W.2d 16, 22 (Mich. App. 1997). Instead, Petitioner is required "to show that the underrepresentation of the [distinctive group], generally and on his venire, was due to their systematic exclusion in the jury-selection process." *Duren*, 439 U.S. at 366. "[D]efendants 'must show more than that their particular panel was unrepresentative[;] *Duren* states that we look at the 'venires' from which 'juries' are selected." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (emphasis added).

At best, Petitioner has conclusorily stated that African-Americans were underrepresented in his jury venire. Moreover, any assertion by Petitioner that he was tried by a biased jury simply because no African-Americans were present in the jury pool simply lacks merit. "Defendants are not entitled to a jury of any particular composition." *Taylor*, 419 U.S. at 538. Petitioner's assertion that an expert could have provided testimony regarding systemic racism to attempt to challenge

the composition of the jury is simply premised upon speculation. Petitioner provides no evidence that such an expert was available to testify and that an expert would have testified in the ways suggested by Petitioner. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (6th Cir. 1991) (footnote omitted); *see also Clark v. Waller*, 490 F.3d 551, 558 (6th Cir. 2007) (rejecting an ineffective assistance claim for the petitioner's failure to provide a "basis on which to conclude that failure to call a possibly favorable witness amounts to constitutionally deficient performance").

Moreover, Petitioner offers nothing from which this Court could conclude that any testimony from an expert regarding "systemic racism" would have led to his acquittal. Because Petitioner's challenge regarding the jury pool and "systemic racism" is entirely conclusory, the Court cannot agree with Petitioner that trial counsel was ineffective for failing to present an expert witness on that topic. Petitioner has not demonstrated that the court of appeals' rejection of this assertion of ineffective assistance of counsel was contrary to, or an unreasonable application of, *Strickland*, and so Petitioner is not entitled to habeas relief with respect to this claim.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:   June 24, 2024                          /s/ Paul L. Maloney
                                                Paul L. Maloney
                                                United States District Judge